J. S35011/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| LORENZO DYER, | : | No. 1544 EDA 2015 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, April 17, 2015,
in the Court of Common Pleas of Lehigh County
Criminal Division at No. CP-39-CR-0002639-2014

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., AND MUSMANNO, J.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:                **FILED MAY 06, 2016**

Lorenzo Dyer appeals from the judgment of sentence entered by the Court of Common Pleas of Lehigh County on April 17, 2015, following his conviction in a jury trial of robbery and criminal conspiracy to commit robbery.[1]  The trial court sentenced appellant to a term of imprisonment of 10 to 20 years on each count to be served concurrently.  We affirm.

The trial court set forth the following:

> [O]n May 22, 2014, at approximately 11:45 P.M., twenty-five (25) year old Kenneth Hunt, Jr.[Footnote 3] was crossing the Eighth Street Bridge in Allentown, Lehigh County, Pennsylvania, on his way to his residence located on the south side of Allentown.  When the victim reached about the halfway mark across the bridge, he was approached by four (4) younger black males.  The four (4) men formed a semi-circle around Mr. Hunt and effectively

---

[1] 18 Pa.C.S.A. § 3701(a)(1)(ii) and 18 Pa.C.S.A. § 903(a)(1), respectively.

surrounded him.[Footnote 4] Mr. Hunt noted that there was an actor, who stood approximately 5'6" to 5'7" in height who had his hair cut close to his head, to his left who brandished a silver barreled handgun and pointed it at his head. This male actor, later identified as [appellant], stood approximately two (2) feet from Mr. Hunt. In addition, the three (3) other males stood to Mr. Hunt's right-hand side.

> [Footnote 3] Kenneth Hunt moved to the Allentown area from the Poconos a couple of years ago in search of different employment. Mr. Hunt works as a manager at Men's [Wearhouse].

> [Footnote 4] The tallest male was approximately 6'1" to 6'2" and he put his hands on the victim. This tall male was not the actor who possessed the firearm.

One of the perpetrators demanded that Mr. Hunt "give him all his things." Mr. Hunt complied. The actors took his HTC-One cellular phone, headphones and his wallet containing such items as his bank cards, identification, and his social security card. One of the males then punched him in the face, splitting his lip. When the victim's head turned, he saw sneakers with lime green eyelets on them. The four (4) black males then left the scene, heading north on Eighth Street. As they were leaving, one of the males stated something along the lines of, "Don't snitch because we know where you live."

Immediately following this incident, Mr. Hunt went to his friend's house that was located close to the scene. Upon his arrival at his friend's residence, Mr. Hunt's friend called 911 to report the incident, and also immediately began to track his cellular phone through a GPS tracker on his Google account.[Footnote 5]

> [Footnote 5] The victim's cellular telephone was locked and could not be

- 2 -

turned off. Consequently, it was able to be tracked through a GPS tracker.

Officer Nicholas Lerch of the Allentown Police Department received a call from the communication center at approximately 11:45 P.M. with regard to an armed robbery of a pedestrian on the Eighth Street Bridge. The communication center indicated that they were looking for a group of four (4) to five (5) black males wearing dark clothing. One was reported to have a handgun. Additionally, Officer Lerch was informed that the victim's cell phone was being traced to the area of 13th and Turner Streets, Allentown, Lehigh County, Pennsylvania. Officer Lerch responded to said location at about 12:00 midnight.

Officer Robert Carbaugh and Officer Andrew Moll of the Allentown Police Department were the first to arrive in the area of 13th and Turner Streets. They noted four (4) black males who matched the description provided by the communication center of the perpetrators of the earlier armed robbery. The males were huddled together with their heads down behind a red pick-up truck parked in the parking lot of the repair garage located at the corner of 13th and Turner Streets.[Footnote 6] Upon viewing Officer Moll exit his police cruiser and approach them, the group of four (4) black males dispersed in different directions. Officer Moll grabbed the closest of the four (4) males (later identified as Daiquan Tracy) and immediately checked him for weapons. He then radioed the other officers to inform them of the situation.

[Footnote 6] The vehicle was parked facing northbound, not in an allotted parking spot. The parking lot was very full at the time that night.

In addition, both Officer Moll and Officer Carbaugh identified [appellant] as one of the four men that they observed that evening.

One of the black males, later identified as [appellant], and who was wearing a black Champion hoody, a pair of navy blue Adidas wind pants and light grey Nike Air Max sneakers with reflective fluorescent green on them, crossed Turner Street and proceeded south on 13th Street.[Footnote 7] Officer Lerch approached [appellant] cautiously at the northeast corner of 13th and Turner Streets, as [appellant] had his left hand in his hoody. Officer Lerch instructed [appellant] to remove his hands and informed him that he was being stopped because he matched the description of a perpetrator in an armed robbery that took place minutes earlier. Officer Lerch patted [appellant] down for officer safety and inquired if he was involved with the other males across the street. [Appellant] stated that he did not know the other men. While Officer Lerch was speaking with [appellant], he received a radio transmission from Officer Steven James that the victim's stolen cell phone was located in one (1) of the [males'] pockets.[Footnote 8] Consequently, [appellant] was placed in investigative detention. Officer Lerch remained with [appellant].

[Footnote 7] The victim explicitly remembered the reflective green sneakers that night as being worn by one of the actors on the Eighth Street Bridge.

[Footnote 8] In addition, Officer Moll radioed that he had found a handgun and the victim's possessions.

Ultimately, all four (4) males were apprehended within a half block of each other. Specifically, Alomar Wee-Ellis was detained by Officer Steven James; and Javard Lane was detained by Officer Robert Carbaugh. Of note, the apprehension of these individuals occurred approximately fifteen (15) to twenty (20) minutes after the robbery and was approximately 1.1 miles from the initial crime scene on the Eighth Street Bridge.

Officer Moll searched the premises of the garage repair lot in the area of where he observed the four (4) suspects huddled together by the red pick-up truck. In the bed of the red pick-up truck, Officer Moll located, *inter alia*, the victim's bank cards, his identification card, and his social security card. In addition, Officer Carbaugh located a silver .380 handgun with five (5) rounds in it under the red pick-up truck.

Meanwhile, Officer Yamil Castillo arrived at the residence of the victim's friend located in the 800 block of South Hall Street. At that time, the victim provided Officer Castillo with a description of the suspects. Soon thereafter, Officer Castillo requested that the victim accompany him to a location to potentially identify suspects that were being detained by the Allentown Police. He transported Mr. Hunt to the area of 13th and Turner Streets, Allentown, Lehigh County, Pennsylvania. While being transported to the area, Officer Castillo informed Mr. Hunt that there were males being detained by the Allentown Police Department who were found with his cell phone[Footnote 9] and his personal effects in their possession.

> [Footnote 9] While the four (4) suspects were being detained, Officer Castillo had the victim call his cell phone and the telephone that was in the possession of these individuals began to ring.

At approximately 12:05 A.M., when the victim arrived at the location where the police officers were detaining the subjects, he was able to confidently identify the black male who pointed a gun at him about twenty (20) minutes earlier that evening. This male was [appellant]. Mr. Hunt based his identification on the [appellant's] height and short haircut. All four (4) men were separated from each other, handcuffed, and in the presence of the police at the time of the identification.

> At the time of trial, the victim was unable to provide an in-court identification, due to the passage of approximately ten (10) months.

Trial court opinion, 6/18/15 at 3-7 (trial exhibit citations omitted).

The record reflects that prior to trial, appellant filed an omnibus pretrial motion seeking to suppress the victim's on-scene identification as unduly suggestive. A suppression hearing took place on October 14, 2014. During the hearing, the victim testified as to the circumstances surrounding his on-scene identification but was unable to positively identify the suspect at the hearing due to the passage of time. (Notes of testimony, 10/14/14 at 12-13.) Subsequently, the trial court found that based on the totality of the circumstances, the victim's identification was reliable and, therefore, denied the motion to suppress.

Appellant presents the following issue for our review:

> Whether the lower court abused its discretion, erred as a matter of law and violated [a]ppellant's due process rights under the constitutions of the United States and the Commonwealth of Pennsylvania in denying his motion to suppress the victim's out-of-court identification where the initial confrontation was brief and at night, the identification was badly flawed because, inter alia, the police told the victim prior to the identification that they believed that the individuals who had been detained were, in fact, the individuals involved in the crime and he had to identify him; and there was no independent basis to ameliorate the tainted identification?

Appellant's brief at 4.

Our standard of review for challenges to the denial of a suppression motion is as follows:

> [We are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

***Commonwealth v. McAdoo***, 46 A.3d 781, 783-784 (Pa.Super. 2012), ***appeal denied***, 65 A.3d 413 (Pa. 2013) (citations omitted).

> In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable. The purpose of a "one on one" identification is to enhance reliability by reducing the time elapsed after the commission of the crime. Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors.
>
> As this Court has explained, the following factors are to be considered in determining the propriety of admitting identification evidence: the opportunity of the witness' [sic] to view the perpetrator at the time

> of the crime, the witness' degree of attention, the accuracy of his prior description of the perpetrator, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. The corrupting effect of the suggestive identification, if any, must be weighed against these factors. Absent some special element of unfairness, a prompt "one on one" identification is not so suggestive as to give rise to an irreparable likelihood of misidentification.

*Commonwealth v. Brown*, 23 A.3d 544, 558 (Pa.Super. 2011) (*en banc*) (internal citations and quotation marks omitted).

Here, appellant complains that the trial court erred in denying his motion to suppress because, based on the totality of the circumstances, the victim's on-scene identification was unreliable for the following reasons: (1) the identification was unduly suggestive because (a) the victim was informed by police prior to the identification that they had detained the individuals who were involved in the crime, and (b) the victim identified appellant while appellant was under visible police detention; (2) the crime was committed when it was dark; and (3) the victim was unable to identify appellant in subsequent court proceedings.

Following a careful review of the record, and contrary to appellant's assertions, we find that the record supports the trial court's factual findings and the legal conclusions drawn from those facts. The trial court found:

> [T]he on-the-scene identification increased the reliability of the identification as a result of the short duration between the commission of the alleged crimes and the identification. According to the evidence, the incident occurred at approximately

> 11:45 P.M. The victim made the identification at approximately 12:05 A.M. Consequently, clearly less than a half hour had elapsed between the occurrence of the event and the on-the-scene identification. Additionally, the victim had sufficient time to view [appellant's] face that was not covered, as he stood approximately two (2) feet from [appellant] while he brandished a handgun on the Eighth Street Bridge. The victim testified that the incident took approximately five (5) to ten (10) minutes to unfold. Furthermore, the victim was confident and certain that [appellant] was the culprit who wielded the handgun at his face. The record was void of any special element of unfairness that would give rise to an irreparable likelihood of misidentification by the victim. To the contrary, the totality of the circumstances surrounding the victim's identification led this Court to find that the identification was completely reliable.

Trial court opinion, 6/18/15 at 13-14.

Indeed, the linchpin in assessing the admissibility of an identification is reliability. *McElrath v. Commonwealth*, 592 A.2d 740, 743 (Pa.Super. 1991) (citations omitted). Here, the record reflects that the victim identified appellant approximately 20 minutes after appellant stood 2 feet in front of the victim for 5 to 10 minutes. Additionally, the victim testified that he was "confident" that he had identified the correct person that held a gun to his head. (Notes of testimony, 10/14/14 at 12.) Despite appellant's claim, the reliability of the victim's identification is not outweighed by undue suggestion based on police remarks made to the victim about the appellant prior to the identification and when the victim identified appellant while appellant was under visible police detention. *See Commonwealth v. Moye*, 836 A.2d

- 9 -

973, 977-978 (Pa.Super. 2003), ***appeal denied***, 851 A.2d 142 (Pa. 2004) (holding that the reliability of the victim's identification of defendant made after the victim observed defendant and unhesitatingly identified him in very close temporal proximity to the commission of the crime was not outweighed by police remarks made to the victim about defendant prior to the identification and when the victim identified defendant while defendant sat in a police van). Consequently, no special element of unfairness exists so as to give rise to an irreparable likelihood of misidentification.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/6/2016