J-S43006-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: R.W.K., II, A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: R.W.K., II | No. 1249 WDA 2017 |

Appeal from the Dispositional Order Entered July 17, 2017
In the Court of Common Pleas of Fayette County
Juvenile Division at No.: CP-26-JV-0000208-2016

BEFORE:  STABILE, DUBOW, NICHOLS, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 22, 2018**

Appellant R.W.K., II appeals from the July 17, 2017 dispositional order of the Court of Common Pleas of Fayette County ("juvenile court"), that adjudicated him delinquent of rape of a child, involuntary deviate sexual intercourse ("IDSI"), and aggravated indecent assault.[1]  Upon review, we affirm.

The facts and procedural history of this case are undisputed.  A juvenile petition was filed against Appellant, alleging that Appellant committed the foregoing offenses on May 24, 2016 against his stepbrother ("the victim") who was eight years old.  On May 23, 2017, the juvenile court conducted an

---

[1] 18 Pa.C.S.A. §§ 3121(c), 3123(b), and 3125(a)(7), respectively.

adjudicatory hearing, at which the Commonwealth presented the testimony of the victim, and several other witnesses.

The victim testified that, when he was eight years old, Appellant molested him when they lived together with his mom and stepfather, who is Appellant's biological father.  N.T. Hearing, 5/23/17, at 3-5.  Specifically, the victim testified that Appellant "put his penis in my butt."  *Id.* at 5.  The victim testified that this happened a lot.  *Id.*  The victim also testified that, in addition to "humping him," Appellant would punch him and say, "I had a bad day, help me take out my anger."  *Id.* at 5-6.  The victim further testified that he did not tell his parents right away because he was confused.  *Id.* at 6-7.

On cross-examination the victim explained that Appellant humped him by putting "his penis into [his] butthole."  *Id.* at 10.  The victim remarked that Appellant inserted his penis into the victim's butthole "about five or ten" times.  *Id.* at 11.  The victim testified that Appellant would penetrate him in their bedroom, usually when their other brothers would be asleep in their bunk beds.  *Id.* at 12-13.  The victim described that when Appellant penetrated him, his penis would be "soft" or "sometimes it would be hard."  *Id.* at 15.  The victim acknowledged that he had talked to his mom, his therapist and his mother's therapist about his testimony.  *Id.* at 16-17.

On re-direct, the victim testified that no one had told him to lie in court.  *Id*. at 17.

The Commonwealth's next witness was, Marie Sandone, a registered nurse at West Virginia University Hospital.  *Id.* at 18.  Ms. Sandone testified

that she examined the victim on May 24, 2016 and interviewed him to determine the extent of the sexual assault. *Id.* at 18-19. She testified that the victim had bruises on the back of his leg, and his back, rectal dilation, and reddening around the anus. *Id.* at 19. Ms. Sandone further testified:

> [The victim] stated that [Appellant] grabbed him and took off his clothes and humped [him]. [The victim] then pointed to his buttocks. He would put his hands on my mouth so I couldn't scream. I could breathe. He said I tried to fight back but couldn't. He put his penis in me. When I asked [the victim] if [Appellant] used anything else like fingers, because that is a question on our list, he nodded yes and when I asked if he used his mouth on his butt he said yes. [The victim] denied his penis being put in his mouth. He said I wouldn't let him. When I asked him if [Appellant] ejaculated or put stuff on you he stated white stuff that he would make me eat. He had ecchymotic or bruised areas on his left calf and he stated that [Appellant] used is knee to hold [him] down. He also had an ecchymotic area to the back and the right flank. He stated [Appellant] gave those to [him]. When I asked if he was threatened he stated he would hurt [his siblings] if [the victim] told anyone.

*Id.* at 20.

On cross-examination, Ms. Sandone acknowledged that she asked the victim questions depending on statements he made, and that she tried to avoid leading questions. *Id.* at 25; *see id.* at 27.

The Commonwealth next called to the stand Charlene Morris, a mental health therapist who worked as a forensic interviewer at the time she interviewed the victim. *Id.* at 30-31. Ms. Morris testified that when she asked the victim if anyone hurt him, he responded that Appellant hurts him and that he was scared of Appellant. *Id.* at 33. She also testified that, during the interview, the victim told her that when he went upstairs to play, Appellant would grab him and hold him down. *Id.* The victim, however, was too upset

to tell Ms. Morris what Appellant did. *Id.* Ms. Morris testified that the victim told her that Appellant would touch the victim's privates and that it happened more than once. *Id.* When asked by Ms. Morris to circle on an anatomical drawing of a boy where Appellant had touched him, the victim "circled the front private and butt." *Id.* at 34. Ms. Morris testified that the victim told her "it felt like a fireball when [Appellant] touched his butt with his private." *Id.* Ms. Morris also testified that the victim wrote that Appellant would say "it feels so good" during the sexual assault. *Id.*

The Commonwealth lastly offered the testimony of Appellant's father, R.K., II who testified that the first time the victim accused Appellant of rape was in May of 2016. *Id.* at 41-42. R.K. also testified that towards the end of June 2016 Appellant confessed to him that Appellant had raped the victim and that Appellant did it because he could not control his anger and rage. *Id.* at 43. R.K. testified that he never hit or threatened Appellant to obtain the confession. *Id.* at 44, 51.

Appellant next testified in his own defense. He testified that he shared a room with his brother P.K. and his step-brothers, N.H. and the victim. *Id.* at 53. Appellant testified that he was never left alone with the victim and that an adult was always at the house. *Id.* at 54-55. Appellant maintained that he never touched the victim's anus, buttocks, penis, or testicles and had never had anal sex with the victim. *Id.* at 56-57. Appellant testified that N.H. had put his penis on the victim's head and that the victim told his mother that Appellant had done it. *Id.* at 58. This led to the mother demanding that

Appellant get out of the house before she left with her children the following day. *Id.* Appellant remarked that, following his stepmother's departure from the house, his father would hit him, prevent him from sleeping, and threaten him with a gun and a knife to make Appellant confess to raping the victim. *Id.* at 59. Appellant testified that his father wanted him to confess so that his stepmother would return. *Id.* at 60. He denied confessing to his father about having raped the victim. *Id.* Appellant also testified that his father hit him in the head with a cup. *Id.* at 61.

Appellant next offered the testimony of his mother, K.K., who testified that she went to see Appellant on June 26, 2016, after R.K. informed her of Appellant's confession. *Id.* at 69. She testified that when she arrived at R.K's home that there was a gun in the kitchen and that R.K. had a knife in his hand that he would point at Appellant. *Id.* at 70. She also testified that R.K. kept trying to get Appellant to say he did it but Appellant refused because he "felt safe now." *Id.* at 71. K.K. testified that she took Appellant home with her after this interaction and that Appellant told her that R.K. had thrown a cup at him and cut his head. *Id.* K.K. testified that she took a picture of the cut when she got home. *Id.*

Following the hearing, the juvenile court adjudicated Appellant delinquent of rape of child, IDSI, and aggravated indecent assault. On July 17, 2017, the juvenile court conducted a dispositional hearing, following which the juvenile court placed Appellant on probation. Appellant filed a post-dispositional motion, challenging the weight of the evidence. On July 31,

2017, the juvenile court denied Appellant's motion, concluding that, contrary to Appellant's contention, "the evidence presented by the Commonwealth was credible and the weight of the evidence ample to adjudicate [Appellant] delinquent." Trial Court Opinion, 7/31/17, at 2. Appellant timely appealed to this Court. Appellant and the juvenile court complied with Pa.R.A.P. 1925.

On appeal, Appellant raises a single issue for our review. "Whether the adjudication of [] Appellant for the crimes of rape of a child, involuntary deviate sexual intercourse, and aggravated indecent sexual assault was against the weight of the evidence." Appellant's Brief at 6 (unnecessary capitalizations omitted). Appellant essentially challenges the juvenile court's credibility determinations and asks us to reweigh the evidence in his favor and substitute our judgment for that of the juvenile court.

In assessing Appellant's weight of the evidence claims, we are mindful that:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.
>
> [*Commonwealth v.*] *Champney*, 832 A.2d [403,] 408 [Pa. 2003] (citations omitted). This Court applies the same standard for reviewing weight claims in juvenile cases. *McElrath v. Commonwealth*, 592 A.2d 740, 745 (Pa. Super. 1991). In considering weight of the evidence claims, it is not the function of

an appellate court to substitute its judgment based on a cold record for that of the judge who conducted the juvenile adjudication hearing. *Id.* Credibility is for the trier of fact, who is free to believe all, part or none of the evidence presented. *Id.* A challenge to the weight of the evidence concedes that sufficient evidence exists to sustain the verdict, but questions which evidence is to be believed. *Commonwealth v. Charlton*, 902 A.2d 554, 561 (Pa. Super. 2006), *appeal denied*, 911 A.2d 933 (Pa. 2006). An appellate court reviews the trial court's exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence. *Commonwealth v. Gibson*, 720 A.2d 473, 480 (Pa. 1998).

*In re R.N.*, 951 A.2d 363, 370–71 (Pa. Super. 2008). Moreover, a court's denial of a motion for a new trial based upon a weight of the evidence claim is the least assailable of its rulings. *Commonwealth v. Rivera*, 983 A.2d 1211, 1225 (Pa. 2009).

Here, as noted, Appellant invites us to re-evaluate the juvenile court's credibility determination. We, however, decline to do so. *In re J.M.*, 89 A.3d 688, 692 (Pa. Super. 2014) ("Conflicts in the evidence and contradictions in the testimony of any witnesses are for the fact finder to resolve") (citation omitted), *appeal denied*, 102 A.3d 986 (Pa. 2014). As explained earlier, we do not disturb the juvenile court's credibility determination by which we are bound. *See Rivera*, 983 A.2d at 1225 ("A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion."). Thus, based on our review of the entire record, as recited above, we cannot conclude the juvenile court abused its discretion in denying Appellant a new trial.

Dispositional order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  10/22/2018