J-A20013-18

NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RICO MURPHY, | |
| Appellant | No. 698 WDA 2017 |

Appeal from the Judgment of Sentence Entered April 13, 2017
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0010514-2014

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                FILED OCTOBER 17, 2018

Appellant, Rico Murphy, appeals from the judgment of sentence of an aggregate term of 12½ - 25 years' imprisonment, imposed following his conviction for aggravated assault and related offenses.  Appellant asserts that the out-of-court identification of Appellant by an eyewitness was unduly suggestive and unreliable.  Appellant argues the trial court erred by denying his motion to suppress that initial identification, as well as all subsequent in-court identifications ostensibly tainted thereby, on that basis.  After careful review, we affirm.

The trial court summarized the pertinent facts of this case as follows:

On June 17, 2017, Richard Palmer was riding a bicycle in the Hazelwood section of the City of Pittsburgh when he suffered two gunshot wounds.  One shot hit him in the back and penetrated vertebrae.  The other shot entered his stomach.  After surgery, Mr. Palmer had difficulty walking.  He had to use a cane.  He had

very little memory of the day of the shooting. He testified that he never saw the shooter.

Diedr[a] Riemenschneider testified that she was with her mother leaving a Rite Aid store in her mother's Ford Mustang in the Hazelwood section of Pittsburgh. As she and her mother were driving down Tecumseh Street[,] she looked to her left and observed Mr. Palmer riding a bicycle. As she watched Mr. Palmer, she observed [Appellant] approach Mr. Palmer and shoot Mr. Palmer two times. She had an unobstructed view of [Appellant] and clearly identified him as the shooter. She saw Mr. Palmer fall to the ground and her mother accelerated their vehicle, attempting to pursue [Appellant] as he fled from the scene. They observed [Appellant] flee down a pathway near the scene of the shooting. Ms. Riemenschneider, fearing that [Appellant] had a gun, convinced her mother to discontinue pursuit of [Appellant] and return to Mr. Palmer to render first aid. They attended to Mr. Palmer and called 911. Ms. Riemenschneider's mother talked to Mr. Palmer in an effort to keep him calm while emergency personnel were en route.

After emergency personnel arrived, Ms. Riemenschneider was interviewed by the police. She informed officers that she saw the firearm used in the shooting. She described it as blue or purple. She provided a description of the shooter's clothing as a white t-shirt with long black basketball shorts. She also described the shooter as a skinny, tall black male wearing a hat. Approximately ten minutes after the police arrived and had apprehended [Appellant], Ms. Riemenschneider was taken to Lytle Street, where [Appellant] was in custody, and she identified [him] as the person who shot Mr. Palmer. He did not have a white t-shirt on at the time. He also was not wearing a hat. He was, however, wearing a tank top.

Detective Douglas Butler testified that he was one of the initial responders to the scene. Relying on information supplied to him when he arrived on scene, he and two other officers began canvassing the area looking for the shooter. As he was walking on Lytle Street, he was greeted by a hysterical resident claiming that while her two sons were playing in the back yard, a black male jumped her fence and the black male was holding a blue gun. The residents ran into the house. Detective Butler, Detective Fetty and Detective O'Dille continued to canvass the area. Detective Butler eventually located [Appellant] lying face down in some brush, attempting to hide from the police. [Appellant] told

- 2 -

Detective Butler that he had thrown the firearm. Detective Fetty, who responded to the scene, observed [Appellant] just prior to his apprehension. [Appellant] was holding an object wrapped in a white t-shirt. Detective Fetty observed [Appellant] attempting to hide the item and the white t-shirt under a fence. After [Appellant] was placed in custody, a blue Cobra Enterprise .380 caliber firearm wrapped in the white t-shirt was recovered from the area where [Appellant] was observed trying to hide it. Bullet casings from .380 caliber ammunition were found at the scene and trial testimony established that the casings were fired from the firearm recovered in this case.

After [Appellant] was taken into custody, he was interviewed by Detective Timothy Rush. [Appellant] initially told Detective Rush that he did not shoot Mr. Palmer and he was in the area of the shooting because he had to go to the bathroom. [Appellant] claimed he became tired and laid down in the area where he was arrested. He also denied shooting Mr. Palmer. After being confronted with the evidence that had been developed in this case, [Appellant] advised Detective Rush that he didn't want to go back to prison. He also asked Detective Rush "how much time [he] would get" if he were convicted of the charges relating to this incident.

Gun[]shot residue was found on [Appellant]'s right hand, front and back.

Trial Court Opinion ("TCO"), 1/17/18, at 2-4.

On September 17, 2014, the Commonwealth charged Appellant with attempted homicide, two counts of aggravated assault, person not to possess a firearm, and recklessly endangering another person. On May 1, 2015, Appellant filed a motion to suppress, contending that Ms. Riemenschneider's initial identification of Appellant was unduly suggestive and unreliable. See Motion to Suppress, 5/1/15, at 2 ¶ 6. Appellant also argued that, as a result, her subsequent identification of Appellant at the preliminary hearing was tainted by the ostensibly unlawful prior identification. Id. at 3 ¶ 10.

The trial court held a suppression hearing on May 11, 2015. On August 3, 2015, the court issued an order denying Appellant's motion to suppress. Appellant proceeded to a jury trial on August 29, 2016.[1] On August 31, the jury found Appellant not guilty of attempted homicide, but guilty on all remaining counts. The trial court held Appellant's sentencing hearing on November 21, 2016. At that time, the court sentenced Appellant to 10-20 years' incarceration for one count of aggravated assault, and to a consecutive term of 2½-5 years' incarceration for person not to possess a firearm. Also on that date, Appellant filed a post-sentence motion. With permission of the trial court, Appellant later amended that motion on April 12, 2017.[2] Post-sentence motions were denied on April 13, 2017. Appellant filed a timely notice of appeal on May 11, 2017. Appellant filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on June 7, 2017. The trial court issued its Rule 1925(a) opinion on January 18, 2018.

Appellant now presents the following question for our review:

Did the trial court err by denying Appellant's motion to suppress the eyewitness identification of [him], and all subsequent identifications, where the identification procedure used was unduly suggestive because the police made improper statements to the eyewitnesses and Appellant was presented for the one-on-one identification in handcuffs while surrounded by police?

_____

[1] The procedural history of this case, from August 2015 until August 2016, is not pertinent to the issues raised in the instant appeal.

[2] Due to a change in counsel, initiated by a motion to withdraw filed by Appellant's trial attorney in the first post-sentence motion, the trial court permitted Appellant to file an amended post-sentence motion through his new counsel. Thus, the April 12, 2017 amended post-sentence motion was timely.

Appellant's Brief at 5.

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

Commonwealth v. McAdoo, 46 A.3d 781, 783-84 (Pa. Super. 2012)

(quoting Commonwealth v. Hoppert, 39 A.3d 358, 361–62 (Pa. Super.

2012)).

> "In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable." McElrath v. Commonwealth, 405 Pa. Super. 431, 592 A.2d 740, 742 (1991). The purpose of a "one on one" identification is to enhance reliability by reducing the time elapsed after the commission of the crime. Commonwealth v. Bullock, 259 Pa. Super. 467, 393 A.2d 921 (1978). "Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors." McElrath, 592 A.2d at 742. As this Court has explained, the following factors are to be considered in determining the propriety of admitting identification evidence: "the opportunity of the witness to view the perpetrator at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the perpetrator, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation." McElrath, 592 A.2d at 743 (citation omitted). The corrupting effect of the suggestive

> identification, if any, must be weighed against these factors. *Commonwealth v. Sample*, 321 Pa. Super. 457, 468 A.2d 799 (1983). Absent some special element of unfairness, a prompt "one on one" identification is not so suggestive as to give rise to an irreparable likelihood of misidentification. *Commonwealth v. Brown*, 417 Pa. Super. 165, 611 A.2d 1318 (1992).

*Commonwealth v. Meachum*, 711 A.2d 1029, 1034 (Pa. Super. 1998).

With these standards in mind, Appellant contends that the out-of-court identification (hereinafter, "show-up procedure") was unduly suggestive, that the factors cited by the trial court regarding the reliability of the identification were not supported by the record, and that, considering the totality of the circumstances, the out-of-court identification was not reliable.

Initially, we must address the Commonwealth's waiver argument that Appellant raises new issues and theories in his brief that were not presented to the lower court. Specifically, the Commonwealth contends that at the suppression hearing, Appellant did not delve into any other matters concerning the reliability of the identification except for the suggestiveness of the show-up procedure itself. Commonwealth's Brief at 15-16 n.7.

We agree that Appellant did not raise any other legal arguments at the suppression hearing beyond the suggestiveness of the show-up procedure. However, following Ms. Riemenschneider's testimony, Appellant's counsel specifically requested the opportunity to provide a brief to the court based on "additional facts that came out" during the hearing that counsel "did not anticipate[.]" Suppression Hearing Transcript ("SHT"), 5/11/15, at 23. In that brief, Appellant did appear to raise claims concerning reliability factors unrelated to the suggestiveness of the show-up procedure itself. Brief in

Support of [Appellant's] Motion to Suppress, 7/2/15, at 4-6. Subsequently, the court held a hearing to consider the motion to suppress in light of the parties' briefs filed after the suppression hearing. At that hearing, Appellant again challenged both the suggestiveness of the show-up procedure, and other factors concerning the reliability of the identification. N.T., 8/3/15, at 5. Accordingly, we disagree with the Commonwealth that Appellant has waived any arguments due to a failure to raise them in the lower court. Moreover, although Appellant's Rule 1925(b) statement appears to make a boilerplate assertion of error,[3] it is clear by Appellant's extensive litigation of this issue in the trial court, and the trial court's responsive Rule 1925(a) opinion,[4] that Appellant's Rule 1925(b) statement was sufficient to notify the trial court of the issues he intended to raise on appeal. Accordingly, we conclude that Appellant did not waive his assertions concerning the ostensible unreliability of the identification procedure apart from the show-up procedure's suggestiveness.

First, we accept Appellant's argument that the show-up procedure utilized in this case was suggestive. Appellant was in handcuffs, surrounded by police officers, and the only person presented to the eyewitness when she positively identified him as the shooter. However, the applicable standard

_____

[3] Appellant raised the claim as follows: "The trial court erred in denying [the] Motion to Suppress the eyewitness identification of [Appellant] by witness Diedra Riemenschneider." Rule 1925(a) Statement, 6/7/17, at 2 ¶ 9(a).

[4] The trial court concluded that there was "nothing about the identification that was unreliable or unduly suggestive...." TCO at 6 (emphasis added).

here is the reliability of the identification, where the suggestiveness of the procedure is but one of many factors to consider. Thus, we now turn to those other factors to consider whether, under the totality of the circumstances, the identification was unreliable.

The opportunity of the witness to view the perpetrator at the time of the crime

We reject Appellant's argument that the factual record establishes that Ms. Riemenschneider was not close enough to Appellant during the shooting to provide an accurate description. Appellant contends that "the witness could have been across the street, or even further away, when she identified him as the shooter." Id. at 19. Appellant bases this argument on Ms. Riemenschneider's testimony that she was about a half of block away when she initially saw the shooter. Id; SHT at 5 ("Q. Whenever you initially saw him how far away from you was he? A. From us? We were on a corner and he was maybe in the middle of the block away from us, probably half a block.") However, as the shooting unfolded, Ms. Riemenschneider and her mother turned onto the street and moved toward the location where the shooting was occurring. SHT at 12. Ms. Riemenschneider's mother, the driver, even attempted to follow the shooter, before ultimately stopping and rendering aid to the victim. Id. Thus, the record does not support a finding that Ms. Riemenschneider only observed the shooter from a half a block away. Instead, the record supports a finding that Ms. Riemenschneider began her observations from half a block away, but had moved closer to the shooter

during the time she had to observe him. We find from this record no reason to conclude that the distance involved was a critical factor to the reliability of the identification. It was close enough for the eyewitness to observe several distinguishing features, discussed infra. At the same time, it was not so close to suggest that the distance itself was a significant factor to bolster the reliability of the identification.

### The witness' degree of attention

Appellant contends that the "Commonwealth did not explicitly elicit testimony regarding the witness' degree of attention...." Appellant's Brief at 24. Nevertheless, Appellant concedes that "it does appear that the witness was paying attention to the incident as a whole." Id. However, Appellant argues that "the record fails to establish that the witness was paying attention to the shooter's face." Id. Appellant does not cite to any case law suggesting that the degree of attention paid to the face, specifically, is conclusive. It is well established that a witness may identify a suspect based on the totality of his appearance, not solely from the facial features alone. Indeed, a "witness may identify an alleged perpetrator from his voice alone...." In re K.A.T., Jr., 69 A.3d 691, 696 (Pa. Super. 2013). Thus, facial recognition is not a prerequisite to a reliable identification. Certainly, "facial identification is the strongest identification testimony[,]" however, "[s]ize, height, weight, hair, clothing, body build, color, location and mannerisms are all acceptable methods of identifying a person." Commonwealth v. Smith, 423 A.2d 1296, 1299 (Pa. Super. 1981). Accordingly, we conclude that this factor bolsters

- 9 -

the reliability of the identification, even if the eyewitness could not specifically describe Appellant's facial features,[5] as the record supports a finding that the eyewitness's attention was focused on the shooting and the perpetrator when the crime occurred.

The accuracy of the prior description of the perpetrator

The trial court concluded that Ms. Riemenschneider accurately described Appellant's appearance before the show-up procedure.  TCO at 6.  She was able to describe Appellant's clothing (white T-shirt and long, black basketball shorts, hat) his general build (very skinny, tall male), his hair (plaited), and the color of the gun (bluish or purplish). SHT at 5; 13.  When she subsequently identified him at the show-up procedure, Appellant presented the same appearance, but without the hat and T-shirt.  However, Ms. Riemenschneider

_____

[5] In any event, we note that the record does somewhat support the trial court's factual conclusion that Ms. Riemenschneider "was able to specifically observe [Appellant]'s face at [the] time [of the shooting]."  TCO at 4.  When she described her perspective at the time of the shooting, she indicated that the shooter was facing the victim at the time, and generally away from her position.  See SHT at 9.  She also indicated that the two were essentially equidistant from her, suggesting, collectively, that she had a view of the shooter's face.  Id.  However, some of the witness' testimony regarding her perspective appears to be in the form of physical gesticulation, and she did not specifically state (nor was she asked) if she had a good view of his face.  Id.  From the trial court's conclusion, we ascertain that the court took her spoken testimony and gesticulations together to conclude that she could see Appellant's face at that time, and Appellant has not directed this Court's attention to anything in the record that refutes that conclusion.  Moreover, this conclusion is consistent with Ms. Riemenschneider's testimony during the preliminary hearing, where she specifically stated that the shooter looked in her direction immediately after shooting the victim.  See N.T. Preliminary Hearing, 8/4/14, at 12.

immediately noticed the absence of the T-shirt. Id. at 6. Appellant argues that the eyewitness failed to initially identify the shooter's race or specific facial characteristics. While such characteristics would have certainly added to the accuracy of her description, we do not view their absence as suggesting that her description was inaccurate. Instead, we weigh this factor in favor of the identification's reliability, as Appellant's appearance at the show-up procedure was closely aligned with Ms. Riemenschneider's initial description to police. Particularly compelling was the correct identification of the color of the gun, which was found wrapped in the very same item of clothing that she had identified as being missing from Appellant during the show-up procedure.

Appellant further complains that the record does not support the conclusion that Ms. Riemenschneider's testimony was describing the shooter as she first observed him, rather than her recollection of what she observed during or after the show-up procedure. See SHT at 5. While we agree with Appellant that there was some ambiguity at the suppression hearing in this regard (on its face, it is not clear if she was asked to describe Appellant as she remembered his appearance at the time of the shooting, or whether, consistent with a prior question, she was asked to describe the initial description she gave to police before the show-up procedure), we note that this specific claim was never raised before the trial court, and it is clear that the trial court understood her testimony to be conveying the initial description of the shooter before the show-up procedure. At no time before Appellant's brief to this Court did he bring this matter to the trial court's attention. As

- 11 -

this aspect of his argument arose during the course of the suppression hearing, it is understandable that he did not raise it in his initial suppression motion. However, Appellant did not raise this specific matter in his subsequent brief in support of the suppression motion, nor did he address it during oral argument before the trial court on August 3, 2015. Additionally, Appellant's boilerplate statement of the issue in his Rule 1925(b) statement did not address the matter. Accordingly, we find this specific aspect of Appellant's claim waived.[6] See Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

The level of certainty demonstrated at the confrontation

Appellant argues that

there is no definitive evidence in the suppression record as to the witness's level of certainty of her identification of Appellant as the shooter. The witness did not make equivocating statements as to the certainty of her identification, however[,] the witness did not provide evidence that showed she was certain in her identification or evidence indicating her level of confidence.

Appellant's Brief at 36.

The Commonwealth only briefly addresses this matter, countering that Ms. Riemenschneider "immediately identified [Appellant] and expressed no

_____

[6] In any event, at the preliminary hearing, Ms. Riemenschneider was specifically asked about the description she gave to police before the show-up procedure. She answered as follows: "I told them that he was a very tall, very thin black male. He had a white -- a long white tee-shirt. It was plain white, and long black basketball shorts." N.T. Preliminary Hearing at 17. This is essentially the same response Ms. Riemenschneider gave at the suppression hearing, lending credence to the trial court's determination that she was describing her pre-show-up description of Appellant at that time as well.

uncertainty or hesitation in her identification." Commonwealth's Brief at 19. The trial court does not separately address this factor in a meaningful manner, other than to describe the identification as "positive[.]" TCO at 5, 6. Given that there is no evidence of equivocation, but also no evidence of the witness's level of confidence beyond the promptness of her identification, we assess no weight to this factor for or against a determination of reliability.

The time between the crime and confrontation

The final factor we consider is the time between Ms. Riemenschneider's observation of the shooting and her identification of Appellant at the show-up procedure. Appellant concedes that this factor weighs in favor of a determination of reliability. We agree. Ms. Riemenschneider identified Appellant a mere 20 minutes after she observed the shooting, while the memory was still fresh in her mind.

Reliability factors vs. the suggestiveness of the show-up procedure

As noted above, we have determined that the show-up procedure utilized by police had some risks of suggestiveness. Appellant was presented to Ms. Riemenschneider in handcuffs and surround by police. However, on balance, we conclude that several factors favored the reliability of the identification. Specifically, Ms. Riemenschneider's degree of attention, the accuracy of her prior description, and the time between the crime and the identification all suggested that her identification was reliable. The other factors we considered favored neither reliability nor a lack thereof.

Thus, we ascertain no error or abuse its discretion in the trial court's refusing to suppress the show-up procedure identification. Consequently, we also conclude that the trial court did not err or abuse its discretion in refusing to suppress Ms. Riemenschneider's subsequent identifications of Appellant, as no taint follows a reliable identification.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/17/2018